UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TAMPA PARK APARTMENTS, INC.,

    Plaintiff,

v.                                          CASE NO. 8:14-cv-1230-T-23AEP

SECRETARY, HOUSING AND URBAN
DEVELOPMENT,

    Defendant.
_____/

**ORDER**

    This action arises out of a dispute between Tampa Park Apartments, Inc., and the Secretary of the United States Department of Housing and Urban Development ("HUD") over the parties' conflicting interpretation of their contractual obligation. Each party moves (Docs. 47, 54) for partial summary judgment.

**BACKGROUND**

    Tampa Park developed both housing and a commercial plaza (collectively, the "Phase II Property") for "low-to[-]moderate-income citizens." (Doc. 1 ¶ 8) On December 20, 1968, to develop the Phase II Property, Tampa Park executed a note (the "Secured Note") in the amount of $2,400,000. (Doc. 1-2 at 1) The Secured Note, which was set to mature on August 1, 2010, granted to the holder a mortgage on the Phase II Property. (Doc. 1-2 at 1, 2) In conjunction with the Secured Note,

Tampa Park signed a "Regulatory Agreement," which required Tampa Park to "establish and maintain" escrow accounts. Among the required escrow accounts were (1) a "Reserve for Replacement" account "to help defray the costs of repairing or replacing [the Phase II Property's] capital items" and (2) a "Residual Receipts" account to "hold[] money that exceeds the amounts needed to operate [the Phase II Property] on a monthly basis." (Doc. 54-2 ¶¶ 20, 21)

Initially, the Secured Note was held and serviced by Stockton, Whatley, Davin & Company and was endorsed by HUD under Section 221(d)(3) of the National Housing Act. (Doc. 1-2 at 1; Doc. 54-3 ¶ 3) On October 26, 1990, after the Secured Note had been re-assigned to, and serviced by, several holders, the Secured Note was assigned to HUD, which held and serviced the Secured Note until maturity on August 1, 2010. (Doc. 54-1 ¶¶ 6–10)

In February 1996, Tampa Park and HUD signed a "Flexible Subsidy Residual Receipts Note" (the "Flexible Note") (Doc. 1-5) and a "Financial Assistance Contract" (Doc. 1-4). The Flexible Note "secures a Loan [of $2,228,587] made by the Secretary for the sole purpose of utilizing those funds pursuant to the Financial Assistance Contract for [the Phase II Property]." (Doc. 1-5 at 1) The Flexible Note's "whole principal sum . . . or any balance thereof, together with interest thereon" would become "immediately . . . due and payable" when the Secured Note "matures or is prepaid." (Doc. 1-5 at 1)

On June 11, 2010, after meeting with Tampa Park, HUD sent a letter that instructed Tampa Park, by August 1, 2010, "to either pay the flexible subsidy loan [Flexible Note] and deferred interest in full or request deferral of the payment for good cause."  (Doc. 54-2 at 36)  Further, the letter stated that HUD "will not forgive the Loan under any circumstance."  (Doc. 54-2 at 36)  On July 9, 2010, Tampa Park requested a deferral "to allow . . . the necessary time for refinancing . . . the outstanding project debt."  (Doc. 54-2 at 39)  The request stated that, although Tampa Park "understand[s] that to date the total principal and interest outstanding is $2,540,589.18," re-paying the Flexible Note by August 1, 2010, would "threaten [Tampa Park's] organization financially."  (Doc. 54-2 at 39, 40)  On July 26, 2010, citing Tampa Park's failure to comply with the application requirements for a deferral, HUD denied the request.  (Doc. 54-2 at 42)

On August 1, 2010, when both the Secured Note and Flexible Note matured, Tampa Park paid in full the Secured Note but paid nothing on the Flexible Note. (Doc. 49 ¶ 9)  On April 17, 2013, after meetings, letters, and almost three years of communication, HUD "issued a Notice of Default and Demand for Payment under the [Flexible] Note."  (Doc. 54-2 ¶ 37)  HUD applied both the Residual Receipts account ($51,115.15) and the Reserve for Replacements account ($412,565.57) to the Flexible Note balance and demanded payment for the remaining balance.  (Doc. 54-1 ¶¶ 15, 16)

Contesting the balance both in the two escrow accounts and in "HUD's entire accounting," Tampa Park argues that "over the forty year payment history on the . . . Secured Note, Tampa Park paid sufficient sums over the amount needed to service interest and principal payments and any other proper disbursement, leaving a balance sufficient to pay the balance on the Flex[ible] Note." (Doc. 1 ¶ 48)

## DISCUSSION

Tampa Park sues (Doc. 1) for a breach of escrow obligations, for a breach of fiduciary duty, and for an accounting. HUD counterclaims (Doc. 34) (1) for a declaratory judgment that the Flexible Note is valid and enforceable, that HUD is entitled to costs of collection (including attorney's fees), and that HUD is entitled to the funds in the Residual Receipts and the Reserve for Replacement escrow accounts and (2) for a breach of the Flexible Note and of the Regulatory Agreement. Tampa Park moves (Doc. 47) for summary judgment on the claim for an accounting. Tampa Park and HUD each move (Docs. 47, 54) for summary judgment on each of HUD's two counterclaims.

**1. HUD's Second Counterclaim: Breach of Contract**

HUD claims that, "[b]y failing to pay the [Flexible Note] upon the maturation of the Secured Note and demand for payment by HUD or submitting a deferment request that complied with HUD requirements, Tampa Park . . . is in breach of the [Flexible Note] and the Financial Assistance Contract." (Doc. 34 ¶ 39) To secure the repayment of the Flexible Note's balance, which is "$2,159,565.75 plus daily

- 4 -

interest of $57.15405 after October 1, 2014," HUD demands a lien on the Phase II Property. (Doc. 34 at 9)

Each party moves (Docs. 47, 54) for summary judgment on the breach-of-contract counterclaim. The parties disagree (1) on whether the funds HUD administered constitute a grant or a loan, (2) on whether HUD is entitled to a lien on the Phase II Property, and (3) on the accuracy of HUD's accounting.

### A. Grant or Loan

Tampa Park argues that no breach occurred because the Flexible Note and the Financial Assistance Contract establish a "grant" that "was not intended to be a debt that Tampa Park had to repay." (Doc. 47 at 18; *see also* Doc. 47-1 at 2) According to Tampa Park, "[t]he 'Whereas' clause of the [Financial Assistance Contract] establishes the public interest purpose of the HUD grant" (Doc. 47 at 4). The "whereas" clause states:

> [T]he Secretary is authorized, pursuant to Section 201 of the Housing and Community Development Amendments of 1978, to provide financial assistance to owners of eligible projects to restore or maintain the financial soundness; to assist in improvement of the management; and to maintain the low-to-moderate-income character of certain projects assisted or approved for assistance under the National Housing Act or under the Housing and Urban Development Act of 1965 . . . .

(Doc. 1-4 at 1) Tampa Park argues that, in exchange for the "grant," Tampa Park "agreed to maintain 'the low[]-and-moderate-income character of the project' and operate in accordance with HUD guidelines and regulations for such property until 8/1/10." (Doc. 47 at 5)

However, as HUD explains, Tampa Park fails to demonstrate that the Financial Assistance Contract's "*Whereas* clause clarifies the specifically contemplated terms of repayment or lack thereof." (Doc. 54 at 20) Instead, "[t]he Financial Assistance Contract's primary purpose is to describe the permissible use of the . . . funds being provided," (Doc. 54-2 ¶ 13) while "the purpose of the [Flexible Note] is to describe the repayment terms of the Flexible Subsidy loan" (Doc. 54-2 ¶ 15). Section 1 of the Flexible Note states that "[t]his note is made and delivered in payment of a Loan made by the Secretary in accordance with the Financial Assistance Contract" and that "all funds paid to [Tampa Park] by the Secretary through the Flexible Subsidy Program continue as an obligation of [Tampa Park] and shall be repaid according to the terms herein." (Doc. 1-5 at 1) Section 3 of the Flexible Note establishes the events upon which the Flexible Note "shall be due and payable." (Doc. 1-5 at 1)

Further, in a July 9, 2010 letter to HUD, Tampa Park requested an "Extension and Deferral of Terms under the Agreement" and stated that "[i]t is [Tampa Park's] understanding that to date the total principal and interest outstanding is $2,540,589.18." (Doc. 54-2 at 39) After HUD denied the request citing Tampa Park's failure to comply with the application requirements for a deferral, Tampa Park again requested an extension to "secur[e] a lending source and/or private bank financing for the full payment of the HUD Flex Sub loan outstanding." (Doc. 54-2 at 46) Thus, as HUD correctly summarizes, the "amount provided to [Tampa Park]

- 6 -

from HUD was a loan that must be repaid as per the terms of the Flexible Note[] and not a grant that did not contemplate repayment." (Doc. 54 at 21)

### B. Lien on the Phase II Property

The parties disagree on the sources of re-payment available to HUD under the Flexible Note. HUD demands a lien on the Phase II Property, but Tampa Park argues that "HUD has no 'interest' in Tampa Park's assets or property to secure the [Flexible] Note, other than the Residual Receipts [escrow account]." (Doc. 57 at 5) The parties' disagreement derives from different interpretations of the Flexible Note's provisions, specifically a re-payment provision and a "nonrecourse" provision.

The Flexible Note's re-payment provision states:

> (3) Principal and Interest on this note shall be due and payable upon the occurrence of any of the following events:
>
> > (a) Where the FHA-Insured project mortgage note matures or is prepaid, the whole sum of this Note or any balance thereof, together with interest thereon, immediately is due and payable, or,
> >
> > (b) Payments on principal or interest on this Note shall be made only from Residual Receipts or non-project funds, and only after obtaining the prior written approval of the Secretary acting by and through the Federal Housing Commissioner. Such payments may be made only after the end of a semi-annual or annual fiscal period; or
> >
> > (c) Principal and interest on this note shall be immediately due and payable upon the sale, foreclosure, refinancing, assignment or any other disposition of the Project. The proceeds from any of the aforementioned dispositions shall be used to repay the indebtedness.

- 7 -

(Doc. 1-5 at 1–2)  The parties agree that, because the Secured Note matured on August 1, 2010, Section (3)(a) governs re-payment.  However, Tampa Park argues for, and HUD disputes, the application of Section (3)(b)'s requirement that payments "be made only from Residual Receipts or non-project funds."  (Doc. 47 at 15–16)  The plain language of Section 3 establishes three independent events, any one of which will trigger Tampa Park's obligation to re-pay the principal and interest due under the Flexible Note.  Section 3(a) applies "[w]here the . . . project mortgage note matures or is prepaid."  Section 3(b) applies "after the end of a semi-annual or annual fiscal period."  Tampa Park fails to explain how a requirement of re-payment that applies specifically to periodic re-payments governs now, after the Flexible Note has matured.

The Flexible Note's "nonrecourse" provision states, "This Note shall be regarded by the Secretary as nonrecourse and the payee or holder hereof shall look solely to the assets of the Partnership and not to the assets of any general or limited partner thereof, for satisfaction of any obligations evidenced by this Note."  (Doc. 1-5 at 2)  According to Tampa Park, this provision "defines or confines the source of repayment" to the "escrows held by HUD."  (Doc. 57 at 11)  Tampa Park argues that the Phase II Property secured only the Secured Note and that, by paying in full the Secured Note, Tampa Park extinguished HUD's lien.  Also, Tampa Park argues that Tampa Park is not a "Partnership," which is undefined in the Flexible Note.

- 8 -

HUD responds that the nonrecourse provision, correctly interpreted, requires HUD to "seek recourse through its interest in the assets of the borrower entity, [Tampa Park], as opposed to seeking any recourse from [Tampa Park's] corporate members personally."  (Doc. 54 at 24–25)  Further, "[b]ecause HUD requires that a borrower be a single asset entity, the only asset of the borrower organization by which HUD could seek recourse to repay the debt owed to it is the [Phase II Property] and its proceeds."  (Doc. 54 at 25)

Although "Partnership" is undefined, a review of the Flexible Note suggests that the term signifies the borrowing entity, Tampa Park, which is also inconsistently designated as the "undersigned," the "maker," and the "owner."  (Doc. 1-5 at 1, 2)  The Flexible Note matured in conjunction with the Secured Note and contains no language, including in the nonrecourse provision, prohibiting HUD from securing a lien on the Phase II Property.

**C. HUD's Accounting**

HUD argues that Tampa Park breached the Flexible Note by failing to pay the balance due under the Flexible Note.  Tampa Park denies that any loan remains unpaid, arguing that "over the forty year payment history on the . . . Secured Note, Tampa Park paid sufficient sums over the amount needed to service interest and principal payments and any other proper disbursement, leaving a balance sufficient to pay the balance on the Flex[ible] Note."  (Doc. 1 ¶ 48)  In order to support their conclusions, both parties rely on a "Schedule of Funds Due and Applied" (Doc. 54-1

at 22–33), which was created by "HUD's third-party loan servicing contractor," Dynaxys, LLC, in response to Tampa Park's request for an accounting of the Secured Note.  (Doc. 54-1 ¶ 24; Doc. 54 at 7)  Tampa Park claims to have paid $6,364,230.17, while HUD argues that Tampa Park paid $5,149,555.21.  (Doc. 49 ¶ 11; Doc. 54-3 ¶ 23)  Thus, Tampa Park disputes the accuracy of "HUD's entire accounting."  (Doc. 1 ¶ 48)

Tampa Park's President, Sybil Kay Andrews, argues that, "[a]s the servicer of the escrow accounts . . . , HUD would send Tampa Park an invoice specifying one amount that Tampa Park was required to remit for the month, without a break down specifying the allocations of that required payment to expenses or escrows."  (Doc. 49 ¶ 8)  Andrews states that "HUD never provided a breakdown to explain the variances in the monthly invoice amounts"; rather, Tampa Park "was instructed to remit the amount invoiced by HUD or be declared in default."  (Doc. 49 ¶ 8)  However, on behalf of HUD, Douglas Hauert of Dynaxys attaches and explains a monthly invoice, which confirms that HUD itemized requested payments, including amounts apportionable to escrow accounts.  (Doc. 54-2 ¶ 15)

Also, Andrews argues, "Tampa Park understood that the balances maintained in the escrow accounts related to the Phase II Mortgage far exceeded any unreimbursed balance on the [Flexible Note] for the Phase II [Property]" because of Tampa Park's experience financing Phase I of the development.  (Doc. 49 ¶ 9)  In 2009, when Tampa Park re-paid a note on Phase I, "the escrow accounts funded

- 10 -

by Tampa Park and maintained by Prudential Financial had a balance that was more than twice the balance remaining on the note executed in conjunction with Phase I flexible subsidy program." (Doc. 49 ¶ 7)  Because "the escrow requirements for the Phase I mortgage and the Phase II Mortgage were comparable," Andrews reasons that "the escrow balances collected by HUD pursuant to the Phase II Mortgage should have likewise carried a balance far in excess of any unreimbursed balance on the [Flexible Note]." (Doc. 49 ¶ 10)

However, Hauert explains that "Tampa Park never contested or challenged the escrow balances that had been transferred" when the Secured Note was assigned to HUD on October 26, 1990.  (Doc. 54-3 ¶ 9)  Hauert's analysis of the "Schedule of Funds Due and Applied" demonstrates that Tampa Park misinterprets the schedule and that Tampa Park incorrectly concluded that Tampa Park paid $6,344,230.17. Specifically, Hauert explains that Tampa Park "inaccurately included" an additional $1,085,313.16 in the $412,565.57 balance in the Reserve for Replacement escrow account and "inaccurately included" an additional $129,361.80 in the $51,115.16 balance in the Residual Receipts escrow account.  (Doc. 54-1 ¶ 47)  These amounts do "not represent additional funds received from [Tampa Park]" but instead represent "internal servicing transactions." (Doc. 54-1 ¶ 38)  The amounts are associated with a "Minority Bank Deposit Program," in which "in order to earn interest" HUD "transferred to investment accounts established on behalf of [Tampa Park]" "any funds received and applied to" the Reserve for Replacement or the

- 11 -

Residual Receipts escrow accounts.  (Doc. 54-1 ¶¶ 13, 37, 39)  Thus, as HUD argues, Tampa Park's calculation includes the money that Tampa Park paid to HUD for the Reserve for Replacement and the Residual Receipts escrow accounts and incorrectly includes the money again when HUD invested the money in the Minority Bank Deposit Program.  (Doc. 54 at 8)

Erik C. Lioy, a certified public accountant, confirms that HUD correctly calculated the balance of the Reserve for Replacement escrow account as $412,565.57 and the balance of the Residual Receipts escrow account as $51,115.16.  (Doc. 54-4 ¶¶ 9, 28)  Lioy explains that the Regulatory Agreement required Tampa Park to submit annually an audited financial statement.  (Doc. 54-4 ¶ 40; *see also* Doc. 54-2 at 12)  Lioy concludes that, "[a]ccording to these [statements], Tampa Park's management was fully aware of the balances for the Reserve for Replacement and Residual Receipts accounts" for the fiscal years ending December 2008 and December 2009.

However, Foster Lovett, Tampa Park's certified public accountant, continues to dispute "HUD's accounting records related to the [Phase II Property]" and argues that the accounting records "are inconsistent and contradictory and have entries that are unsupported by proper documentation."  (Doc. 57-1 ¶ 2)  Specifically, Lovett states that HUD failed to supply the "actual source accounting records or the actual general ledgers for Tampa Park."  (Doc. 57-1 ¶ 2)  Instead, HUD supplied a Word document and an Excel report," both of which are "re-presentations of information

- 12 -

that is unsupported by source documentation showing all the transactions involving transfers of Tampa Park's funds." (Doc. 57-1 ¶ 2)  Further, Lovett analyzes HUD's records and identifies several "discrepancies and items that HUD must reconcile or explain[] in order for Tampa Park to gain assurance as to the proper accounting for expenditures and the proper disbursement and allocation of revenue made by HUD to expense and escrow accounts, including but not limited to the Residual Receipts account." (Doc. 57-1 ¶ 4)  For example, Lovett describes how "[t]he HUD Excel Document does not agree with the HUD Word Document" and notes "violation[s] of Generally Accepted Accounting Principles."  Lovett identifies issues of material fact properly resolved at trial, not by summary judgment.

Accordingly, neither Tampa Park nor HUD is entitled to summary judgment on HUD's breach-of-contract counterclaim.

**2. HUD's First Counterclaim: Declaratory Judgment**

HUD counterclaims (Doc. 34) for a declaratory judgment that the Flexible Note is valid and enforceable, that HUD is entitled to costs of collection (including an attorney's fee), and that HUD is entitled to the funds in the Residual Receipts and the Reserve for Replacement escrow accounts.

Tampa Park correctly responds that "[t]he 'validity' and 'enforceability' of the [Flexible] Note [are] not at issue" and that "[t]he issue of the terms to be enforced are subsumed within the Count II breach action." (Doc. 47 at 19)  Accordingly, HUD's

request for a declaratory judgment that the Flexible Note is valid and enforceable and that HUD is entitled to costs of collection is denied as moot.

"Both sides agree that Residual Receipts are applied to reduce the [Flexible] Note balance." (Doc. 57 at 16) Tampa Park disputes only the balance of, not HUD's entitlement to, the Residual Receipts and the Reserve for Replacement escrow accounts. Accordingly, the motion for summary judgment is granted to the extent that HUD is entitled to apply the balances of the Residual Receipts and the Reserve for Replacement escrow accounts to the balance of the Flexible Note.

### 3. Count III: Equitable Accounting

Tampa Park moves (Doc. 47) for summary judgment on the claim for an equitable accounting. However, "[w]hen a judgment for breach of contract is obtainable, the remedy at law is considered adequate, precluding the need for the imposition of an equitable remedy." *Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1541 (11th Cir. 1990) (Johnson, J.). Count I of Tampa Park's complaint demands damages for a "Breach of Escrow Obligation under [the] Phase II Mortgage." Accordingly, Tampa Park is not entitled to summary judgment on its claim for an equitable accounting.

### CONCLUSION

Both parties' motions (Doc. 47, 54) for summary judgment on HUD's second counterclaim are **DENIED**. HUD's motion (Doc. 54) for summary judgment on HUD's first counterclaim is **GRANTED IN PART**. HUD is entitled to the Residual

- 15 -

Receipts and the Reserve for Replacements escrow accounts.  Otherwise, HUD's motion (Doc. 54) for summary judgment on HUD's first counterclaim is **DENIED AS MOOT**.  Tampa Park's motion (Doc. 47) for summary judgment on HUD's first counterclaim is **DENIED**.  Tampa Park's motion (Doc. 47) for summary judgment on the claim for an equitable accounting is **DENIED**.

    ORDERED in Tampa, Florida, on February 2, 2016.

                                                      STEVEN D. MERRYDAY
                                                      UNITED STATES DISTRICT JUDGE